UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

|  |  |  |
|---|---|---|
| DIANNA VORHOLT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 08-206-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MICHAEL J. ASTURE, Commissioner of | ) | **AND ORDER** |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

The plaintiff, Dianna Vorholt, brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of an administrative decision of the defendant, Commissioner of Social Security

("Commissioner"), which denied the plaintiff's April 19, 2004, application for disability

insurance benefits ("DIB"). For the reasons provided below, the Court denies Vorholt's Motion

for Summary Judgment, R. 14, and grants the defendant's, R. 15.

**FACTUAL BACKGROUND**

The plaintiff, Dianna Vorholt ("Vorholt") claims she became disabled on December 12,

2003. On that day, Vorholt checked into St. Luke Hospital because of chest pains and panic

attacks. Transcript ("Tr.") at 284-308. Later, on December 30, 2003, the VA hospital admitted

Vorholt for psychiatric evaluation because she was complaining of depression and anxiety. *Id.*

at 14, 432. Testing suggested that she had bipolar disorder with some psychotic symptoms. *Id.*

at 14, 411. Due to a history of sexual and physical abuse with flashbacks, Vorholt was also

diagnosed with post traumatic stress disorder ("PTSD"). *Id.* at 14.

During the December 30, 2003, visit, Vorholt was constantly seeking medication, requesting additional pain medication, antidepressants, and anti-anxiety medication. *Id.* at 417. Prior to the visit, Vorholt had stopped taking her antidepressant medications because she claimed she was feeling better. *Id.* at 417-418. Vorholt admitted that she had been abusing Klonopin, a drug used to control epileptic seizures and treat panic disorders. *Id.* at 429. The medical reports from the visit indicated Vorholt had a normal gait, normal speech, and only mild anxiety. *Id.* at 17. The medical notes also indicated that her thought process was logical, linear, and coherent, which suggested her bipolar disorder and PTSD did not completely affect her mental capacity. *Id.* at 17; 445. She had no suicidal ideation or homicidal ideation. *Id.* Yet, she mentioned that she smoked marijuana one to two times per week, and drank two to three beers on Fridays and a six pack on Saturdays. *Id.* at 17. After being denied the medication she wanted, Vorholt requested to leave so she could go to another hospital. *Id.* at 17; 417-18.

Her care was transferred to the VA in April 2004. *Id.* at 17. She had voluntarily stopped taking Remeron, an antidepressant, six months earlier and also had been noncompliant with her medical appointments. *Id.* This noncompliance resulted in an episode of mania, an abnormally elevated mood state. *Id.*

On June 28, 2004, a consultative examiner, Jean Deters, Psy.D., examined the plaintiff. *Id.* at 318-24. He noted that Vorholt demonstrates chronic, severe mental illness. *Id.* at 324. He stated that the plaintiff was not able to sustain her concentration and persistence in completing tasks in the normal amount of time and was easily overwhelmed with interpersonal dynamics.

-2-

*Id.* Dr. Deters found that the plaintiff's Global Assessment of Function ("GAF") was 40. *Id.* at 323.

On August 27, 2004, Edward Ross, Ph.D., a state agency physician, examined Vorholt. *Id.* at 360-79. Dr. Ross believed that Vorholt's self-reported activities of daily living looked superior to Dr. Deters's residual functional capacity ("RFC") assessment. *Id.* at 24. Dr. Ross found that, even when Vorholt abused substances, she was capable of: understanding and recalling simple work; completing mental aspects of work on a schedule; tolerating coworkers and supervisors; and adopting to gradual and infrequent changes at work. *Id.*

In a doctor's visit in September 2004, her gait was slow earlier in the visit but improved as she left the examination area, which suggested that Vorholt actually had no issues moving around. *Id.* at 17-18. At that visit, she asked for more Vicodin, a pain reliever, because she had run out of it early after she doubled her dosage. *Id.* at 18. She refused to take Tylenol instead for her pain. *Id.*

On October 18, 2004, Dr. Augustina Baluyot completed a medical assessment of Vorholt's ability to do work-related activities. *Id.* at 595-597. From 2001 until 2004, Dr. Baluyot treated Vorholt. *Id.* 595. Dr. Baluyot diagnosed the plaintiff with bipolar disorder. *Id.* at 595-97. She listed the plaintiff's symptoms, including: fluctuating mood; anxious; decreased concentration; attention and memory; forgetful; rapid cycle mood swings; racing thoughts; and an inability to complete tasks. *Id.* She noted Vorholt had poor or no ability to: deal with the public; use judgment; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand and carry out complex or detailed job

-3-

instructions; or relate predictably in social situations. *Id.* at 596-97. Dr. Baluyot concluded that "stress of any kind would cause an exacerbation of [Vorholt's] condition and [she would] relapse even further into a depressed state." *Id.* at 597. Moreover, because of the plaintiff's condition, Dr. Baluyot believed Vorholt would be absent from work more than three days per month. *Id.*

On December 6, 2004, Vorholt was hospitalized again, this time for depression with suicidal ideation. *Id.* at 18. She denied current use of marijuana and alcohol, but her husband admitted that Vorholt used cocaine and alcohol while he was at work. *Id.* Her urine toxicology was positive for cocaine, marijuana, and Zoloft. *Id.* Her medication was adjusted and she began feeling stable again. *Id.*

Vorholt left the hospital and went to a different doctor, Dr. Zhewu Wang, claiming she was not given medication following her December 6, 2004, visit. *Id.* But, according to computer records, she had picked up the medication on December 10, 2004. *Id.* Based on Dr. Wang's calculations, Vorholt should have had at least 20 days of Ativan—a drug used to treat anxiety disorders—left. *Id.* She claimed that she did not. On that visit, her drug screen was also positive for narcotics and marijuana. *Id.* Dr. Wang suspected that Vorholt was abusing her medication and discontinued Ativan. *Id.* at 639. At that time, Vorholt requested a new psychiatrist. *Id.* at 18. Dr. Wang had also refused to give her Ativan in November 2004 because she had completed her prescription early. *Id.*

In March 2005, she claimed improvement following the December 2004 hospitalization. *Id.* at 18. Her husband had been taking her Vicodin and Lorazepam, since she no longer took them. *Id.* Dr. Linda Klein, a Medical Director at the VA hospital, said Vorholt was stable

enough to do trauma work (to treat her PTSD), but, among other things, the doctors needed to monitor Vorholt since her substance use appeared connected to episodes of mania.  *Id.*  Dr. Klein treated Vorholt from March 25, 2005, until August 21, 2006.  *Id.* at 1104.

Vorholt's treatment was relatively normal for over a year, but in May 2006 she claimed that she had been experiencing increased pain since discontinuing Methadone, a pain reliever. *Id.* at 19.  In its place, Vorholt had—without a doctor's instruction to do so—increased Vicodin consumption above her prescribed amount.  *Id.*  Instead of taking three tablets per day as prescribed, she had been taking up to eight tablets per day.  *Id.*  She requested Morphine; but, her request was denied.  *Id.*  While she declined Toradol, an anti-inflammatory and pain reliever, Vorholt ultimately agreed to restart Methadone.  *Id.*  Later that same day, she was also sent to St. Luke Hospital.  *Id.*  There, she received Morphine, Phenergran (an antihistamine), and Vicodin. *Id.*

In June 2006, Vorholt tested positive for marijuana and admitted using it in 26 out of the last 30 days.  *Id.*  But she apparently stopped using marijuana because it affected her ability to get opiate analgesics like Morphine and Methadone.  *Id.* at 19-20.  In the previous month, she again had completed her Atvian prescription early—this time by a week.  *Id.* at 19.  While her treating physician was still giving her Vicodin, she could not get any more opiates from her pain clinic unless she entered a substance abuse treatment program.  *Id.*  She apparently agreed to enter a substance abuse treatment program so she could get the opiates.  *Id.* at 20.

In August 2006, Dr. Chittaranjanbhai Shukla, Vorholt's doctor at the pain clinic, noted that she was using primitive defenses of rationalizing and denial regarding her marijuana use.

*Id.* He concluded that she had at least some psychological dependence on medications but was in complete denial. *Id.* Dr. Klein noted that Vorholt completed her Lorazepam (a generic version of Ativan) early that month also. *Id.*

In a letter dated August 21, 2006, Dr. Klein claimed that she diagnosed Vorholt with PTSD, bipolar disorder, panic disorder with agoraphobia, and borderline personality disorder. *Id.* at 1104. In addition, Dr. Klein mentioned that Vorholt participated in two courses of psychotherapy to target her PTSD symptoms but the severity of her anxiety and her mood lability (a symptom of bipolar disorder) made it difficult for her to do trauma focused work. *Id.* Based on Vorholt's symptoms, Dr. Klein concluded that Vorholt was unable to work in any setting and anticipated this was likely to last at least a year but likely longer. *Id.* at 1104A.

In September 2006, Vorholt asked another doctor for Vicodin because she was apparently a "study patient" having abdominal pain. *Id.* at 20. The doctor refused to give her the medication. *Id.* In October 2006, Vorholt went to St. Luke with a headache, claiming she had taken some Vicodin and Compazine without relief. *Id.* She initially received saline, Reglan, and Morphine. *Id.* After allegedly developing chest discomfort on her left side, she received additional Morphine. *Id.* The attending physician noted that she had a negative cardiac workup and her pain was atypical. *Id.*

While Vorholt complained of pain due to rainy weather in October 2006, she appeared to walk, sit, stand, and move without difficulty. *Id.* She declined alternatives to pain management, including Methadone, physical therapy, and water therapy. She claimed that she

completed her Vicodin prescription early because she was experiencing migraine pain. *Id.* As a result, she asked a nurse for additional Vicodin. *Id.*

In general, the record is unclear as to the source of Vorholt's pain, which required Morphine and Vicodin. While Vorholt complained of back pain, there is no medical evidence of any such physical impairment. *Id.* at 15-16. Examinations in August and September 2004 demonstrate that her back had no medical issues. *Id.* She did mention that she experienced pain from her ulcerative colitis. *Id.* at 1263-64. One of her treating physicians, Dr. Klein, felt there was a strong psychological contribution to the pain and, hence, recommended non-Morphine treatments. *Id.* at 22-23. Dr. Shukla also encouraged alternative pain treatments but Vorholt refused to take part in them. *Id.* at 23.

## PROCEDURAL HISTORY THROUGH THE ALJ HEARING

Vorholt filed her application for disability insurance benefits on April 19, 2004. *Id.* at 65-68. She alleged that she became disabled on December 12, 2003. *Id.* at 65. The Social Security Administration denied Vorholt's application initially on September 3, 2004, *id.* at 36-39, and then again upon reconsideration on November 10, 2004, *id.* at 41-43. Thereafter, Vorholt filed a written request for a hearing. *Id.* at 44. On September 21, 2006, Administrative Law Judge Deborah Smith ("ALJ") conducted a pre-hearing and heard testimony from Vorholt. *See id.* at 1283-96 (transcript of pre-hearing). Subsequently, on December 11, 2006, the ALJ conducted a hearing and heard testimony from Vorholt, her husband, and a vocational expert. *See id.* at 1247-82 (transcript of hearing).

At the hearing, Vorholt testified that she already received $485 in VA benefits per month. *Id.* at 1251. Vorholt, who was 42 years old at the time of hearing, had two years of college education and had worked in various jobs, including as a phlebotomist. *Id.* at 1251-52. She had not worked since she allegedly became disabled on December 12, 2003. *Id.* at 1252. Vorholt testified regarding how physically taxing her previous jobs were; in particular, she testified how much standing she had to do in her previous jobs as well as how much weight she had to lift and carry in those jobs. *Id.* at 1252-55. She left her last job as a phlebotomist because she was having trouble with her "concentration level," resulting in an inability to sustain concentration. *Id.* at 1255. At the pre-hearing, she indicated that her biploar disorder and anxiety caused the concentration level issue. *Id.* at 1255-56. Vorholt further testified that the main reason she quit her last job was because of the stress of the job, which caused her anxiety. *Id.* at 1257. Among other things, dealing with people like her supervisors caused her stress and she would "clam up" or have a "panic attack." *Id.* at 1257-58. Her "panic attacks" apparently occurred at least once or twice a month. *Id.* at 1261. She claimed that her ability to concentrate would wane when she had these bouts of anxiety. *Id.* at 1259. She said that at least once a week she had a "bad day" where she would do nothing. *Id.* at 1259-60.

To treat her mental health problems, she had seen Dr. Linda Klein and Dr. Augustina Baluyot; but she had not seen Dr. Baluyot since 2004. *Id.* at 1256. At the time of hearing, she had been seeing a psychiatrist at the VA. Though these were her treating physicians, she claimed that she had not discussed her drug seeking behavior with any of her doctors. *Id.* at 1257.

The ALJ questioned her on her physical limitations as well, and Vorholt stated that she could sit comfortably for a few hours only and stand and walk for a couple of hours. *Id.* at 1262. She had various physical ailments, including arthritis and epilepsy. *Id.* at 1255-56. While her seizures were apparently controlled, she claimed to experience pain from the ulcerative colitis. *Id.* at 1263-64. She lifted and carried some things in her daily life. *Id.* But her husband did things like carrying laundry up stairs. *Id.*

With respect to her compliance with medical advice, Vorholt stated that she always took her prescribed medicine. *Id.* at 1264. As for other substances, she testified that the last time she had alcohol was in December 2005 at her daughter's wedding. *Id.* at 1265. She stated that she had no problem with alcohol use since she allegedly became disabled. *Id.* She claimed that the last time she smoked marijuana was one to one-and-a-half months before the September 2006 pre-hearing. *Id.* at 1257.

After her testimony, her husband, Bruce Vorholt ("Mr. Vorholt"), testified. He stated that the plaintiff had been married to him for thirteen years. *Id.* at 1267. He had seen Vorholt's panic attacks. *Id.* at 1269. He claimed that she would get visibly nervous, while starting and stopping various tasks. *Id.* She would not make sense and sometimes started to cry. *Id.* She also went through depressed phases. *Id.* at 1269-70.

Mr. Vorholt admitted that two years ago he had used her pain medication, but he claimed that he was on medication then also and was simply borrowing it from her. *Id.* at 1270-71. Further, with respect to Vorholt's possible substance abuse, he claimed to have no knowledge of Vorholt consuming alcohol recently nor using or abusing prescription medication. *Id.* at 1271.

-9-

Mr. Vorholt testified that the plaintiff smoked marijuana in front of him but not in at least two to three months.  *Id.* at 1270.  He claimed, even when she did smoke marijuana, it was only once or twice a month.  *Id.*

A vocational expert, Robert E. Breslin, testified that he was familiar with the Commissioner's definition of sedentary to heavy work and with *The Dictionary of Occupational Titles*.  *Id.* at 1272.  Breslin compared Voholt's testimony regarding her jobs with how those jobs were defined in the dictionary.  *Id.* at 1273-74.  He found most of her descriptions to be accurate.

Breslin also addressed a variety of hypotheticals, presented by the ALJ and Vorholt's attorney, about how Vorholt's alleged physical and mental limitations might impact a person's ability to perform various jobs, including those that Vorholt had once held.  *Id.* at 1274-82.  In light of Vorholt's testimony, Breslin testified that Vorholt would not be able to work—primarily because of her psychological limitations.  *Id.* at 1279.  He further testified that if a person does not seem likely to handle the pressures of a normal workday then it would preclude her from any type of work.  *Id.* at 1281.  Additionally, he said if someone cannot sustain concentration and persistence in completing tasks then it would also eliminate all job opportunities for her.  *Id.*  He also stated that if someone had problems with supervisors and staff that could also make all jobs unavailable to her.  *Id.*

Breslin also analyzed the evaluation of Vorholt's health that Dr. Jean Deters had provided on behalf of the Administration on June 24, 2008, *see id.* at 318-24.  Breslin did not agree with Dr. Deters'[1] evaluation because he believed someone with a GAF of 40 would have a

---

[1]     The transcript erroneously refers to Dr. Deters as "Dr. Heeders."

severe—not moderate—impairment. *Id.* at 1276. He testified that someone with a GAF of 40 would be too ill to maintain employment. *Id.*

**THE ALJ'S ANALYSIS FOLLOWING THE HEARING**

In evaluating a claim of disability, an ALJ conducts a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920.[2] First, if a claimant is working at a substantial gainful activity, she is not disabled. *Id.* § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. *Id.* § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. *Id.* § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. *See id.* § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. *See id.* § 404.1520(f).

---

[2]     The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520. Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (citations omitted).

In this case, at Step 1, the ALJ found that Vorholt had not engaged in substantial gainful activity since the application date.  Tr. at 14.  At Step 2, the ALJ found that Vorholt had a combination of severe impairments.  *Id.* at 14-16.  In particular, the ALJ cited to the following impairments: seizures, depression, anxiety, bipolar disorder, posttraumatic stress syndrome, panic disorder, personality disorder, and a substance abuse disorder.  *Id.*  At Step 3, the ALJ found that Vorholt did not have an impairment or combination of impairments that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Thus, the ALJ could not find Vorholt was disabled on that basis.  The ALJ then proceeded to Step 4.  At that stage, the ALJ found that Vorholt's impairments did not prevent her from doing past relevant work as a phlebotomist.  *Id.* at 16-24.  While this would have been a sufficient basis on which to conclude that Vorholt was not disabled, the ALJ still proceeded to Step 5.  *See* 20 C.F.R. § 404.1520(e).  Considering Vorholt's age, education, work experience, and residual functional capacity ("RFC"), the ALJ found at Step 5 that there were a significant number of jobs in the national economy that Vorholt could perform.  Tr. at 25-26.  Therefore, on that basis, the ALJ could not find Vorholt was disabled.  For the foregoing reasons, the ALJ issued a decision on February 23, 2007, finding that Vorholt was not disabled, and therefore not entitled to DIB.  Tr. at 26.  On September 9, 2008, the Appeals Council declined to review the ALJ's decision, *id.* at 5-7, at which point the ALJ's decision became the final decision of the Commissioner of Social Security.

Vorholt now seeks review in this Court.  In her motion for summary judgment, she argues that the ALJ improperly discounted the opinions of her treating physicians, Dr. Baluyot and Dr. Klein, R. 14 at 6-8, and that the ALJ erred because she did not use medical evidence when she

came to her conclusions about Vorholt's RFC, *id.* at 9-10.  The Commissioner has also filed a motion for summary judgment, R. 15.

**DISCUSSION**

Judicial review of the Commissioner's decision is restricted "to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(g); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip*, 25 F.3d at 286.  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (quotations and citations omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole.  *Cutlip*, 25 F.3d at 286 (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981)).  If the Commissioner's decision is supported by substantial evidence, this Court must affirm that decision even if there is substantial evidence in the record that supports an opposite conclusion.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)).  Further, when reviewing the Commissioner's decision, the Court cannot "try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th

Cir. 2007) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)).  Since substantial evidence

supports the ALJ's decision, it must be upheld.

### The ALJ Properly Discredited the Opinions of Vorholt's Treating Physicians

A treating physician's medical opinion is entitled to controlling weight if it is (1)

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"not inconsistent with the other substantial evidence in [the plaintiff's] case record."  20 C.F.R.

§ 404.1527(d)(2); *see also Jones*, 336 F.3d at 477 ("If the treating physician's opinion is not

supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as

he sets forth a reasoned basis for her rejection." (citing *Shelman v. Heckler*, 821 F.2d 316, 321

(6th Cir.1987))).  In this case, the ALJ appropriately discounted the opinions of Vorholt's treating

physicians because they are inconsistent with the other substantial evidence in the record.

Two of Vorholt's treating physicians, Dr. Klein and Dr. Baluyot, both opined that Vorholt

was disabled and could no longer work because of her mental disorders.  The ALJ discredited

their opinions because they were inconsistent with other substantial evidence in the record.  Dr.

Baluyot was Vorholt's treating physician from 2001 to 2004.  Tr. at 23.  The ALJ acknowledged

that Dr. Baluyot mentioned Vorholt had a history of substance abuse.  *Id.*  However, the ALJ

noted that Dr. Baluyot's notes were silent as to the nature and frequency of Vorholt's drug use

and her compliance with the treatment regimen.  *Id.*  Before discrediting Dr. Baluyot's

conclusions, the ALJ carefully reviewed Vorholt's medical history and noted there was

substantial evidence of Vorholt:  actively seeking Morphine and Vicodin, completing her

prescriptions early by increasing her dosages without a doctor's approval, stopping her

medication early when she felt it was no longer required, giving her medication to her husband, using marijuana at times on a regular basis, refusing some pain medication and other non-Morphine pain treatment, looking for and requesting new doctors when one would deny her the medication she desired, and possibly misrepresenting symptoms of pain to get certain medication. *Id.* 17-23 (the ALJ's review of the plaintiff's medical history from December 2003 to October 2006). This evidence demonstrated to the ALJ that Vorholt had a substance abuse problem and often did not comply with her medical treatment. Since Dr. Baluyot's notes failed to address these issues in a meaningful way, the ALJ found them to be inconsistent with other substantial evidence in the record. *Id.* at 23; *see also* 20 C.F.R. § 404.1527(d)(2). Based on this inconsistency, the ALJ gave little weight to Dr. Baluyot's conclusions.

In addition, the ALJ concluded that Dr. Baluyot did not present an accurate summary of Vorholt's symptoms from mental impairments, and that Dr. Baluyot's suggested limitations were not supported by the record as a whole. *Id.* Dr. Baluyot stated that Vorholt had poor or no ability to: deal with the public; use judgment; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand and carry out complex or detailed job instructions; or relate predictably in social situations. *Id.* at 596-97. In contrast, the ALJ noted, based on the plaintiff's testimony at the hearing, that Vorholt admitted to being capable of performing the activities of daily living. *Id.* Further, the ALJ pointed out that medical records showed that Vorholt's memory was intact, and that she could follow instructions during evaluations. *Id.* The ALJ also found that there was substantial evidence of only moderate impairment of her social functioning, concentration, persistence, and pace. *Id.* Thus, there are

considerable inconsistencies between Dr. Baluyot's statements and the evidence contained in the rest of the record.  By relying on all of these inconsistencies, the ALJ set forth a reasoned basis for rejecting Dr. Baluyot's opinion, and therefore did not err in doing so.  *See Jones*, 336 F.3d at 477 (citing *Shelman*, 821 F.2d at 321); *see also* 20 C.F.R. § 404.1527(d)(2).

Like with Dr. Baluyot's opinion, the ALJ discredited Dr. Klein's opinion that Vorholt could not work in any setting.  The ALJ did not err in discrediting this opinion either, as she gave a reasoned basis for her rejection of Dr. Klein's opinion—i.e., that it was inconsistent with other substantial evidence in the record.  The ALJ stated that Dr. Klein's August 21, 2006, letter, which summarized Vorholt's treatment and response to the treatment, was incomplete.  Tr. at 23.  While the ALJ noted that the letter discussed Vorholt's anxiety and depressive symptoms, it was incomplete because, like Dr. Baluyot's notes, it only mentioned in passing the substance abuse problem.  What is more, the letter failed to mention how Vorholt's symptoms were affected by substance abuse.  *Id.*  In light of the substantial evidence which showed that substance abuse played some role in Vorholt's symptoms and that Vorholt was noncompliant, *see id.* at 17-23, the ALJ felt that Dr. Klein's opinion was inconsistent with the other evidence in the record.  *Id* at 23; *see also* 20 C.F.R. § 404.1527(d)(2).

For the same reasons the ALJ rejected Dr. Baluyot's suggested limitations of Vorholt, she rejected Dr. Klein's.  Dr. Klein felt, among other things, Vorholt's anxiety prevented her from working in any setting.  The ALJ, on the other hand, felt that even with Vorholt's ailments, she was not disabled from all work.  *Id.*  Hence, the ALJ also gave little weight to Dr. Klein's opinion of Vorholt's ability to function.  Thus, as with the rejection of Dr. Baluyot's opinion, the ALJ set

16

forth a reasoned basis for rejecting Dr. Klein's opinion and therefore did not err in doing so. *See Jones*, 336 F.3d at 477 (citing *Shelman*, 821 F.2d at 321); *see also* 20 C.F.R. § 404.1527(d)(2).

Vorholt asserts that the ALJ erred because it relied on the report of a state agency physician, Dr. Ross. *See* Tr. at 24 (stating that Dr. Ross' opinion will get "significant weight" from the ALJ). Vorholt provides no legal reason why the ALJ could not rely on the report of the state agency physician. She mentions that Dr. Ross had only one examination of Vorholt, as opposed to Dr. Klein and Dr. Baluyot, who saw Vorholt various times for treatment. This limited contact might make the physician's evidence less credible, but it does not necessarily prevent the ALJ from using it as a basis for her conclusion. After the ALJ found the treating physician testimony to be less than credible, she was free to consider other evidence if she found it credible. *See, e.g., Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir.1987) ("Since the ALJ has the opportunity to observe the demeanor of a witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984))).

Vorholt also argues that Dr. Ross should have been afforded less weight because he may not have reviewed the opinions of her treating physicians. Again, such a credibility determination is left to the ALJ's discretion. *See Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (stating that the court's "role is not to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony" (citing *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987))). Dr. Ross conducted his own examination and, thus, was not required to look at Vorholt's treating physicians' opinions. The fact that Dr. Ross may have not looked at those

17

opinions does not affect the fact that the ALJ could have—and did—find Dr. Ross' report to be credible.

Vorholt suggests that the ALJ made its determination solely on the basis of Dr. Ross' report and not on the record as a whole. Vorholt is correct that the ALJ did find Dr. Ross' opinion credible. For instance, the ALJ agreed with Dr. Ross' assessment that self-reported activities of Vorholt indicated that she was not as limited in her mental and physical capabilities as others suggested. *See* Tr. at 24. Dr. Ross found that, even when Vorholt abused substances, she was capable of: understanding and recalling simple work; completing mental aspects of work on a schedule; tolerating coworkers and supervisors; and adopting to gradual and infrequent changes at work. *Id.* While Dr. Ross' opinion alone is sufficient to support the ALJ's decision, the ALJ relied on more than Dr. Ross' opinion in reaching her conclusion. The ALJ also relied on notes from a doctor's visit in September 2004, where her gait was slow earlier in the visit but improved as she left the examination area. *Id.* at 17-18. This suggested that Vorholt actually had no issues moving around. *Id.* Further, in October 2006, Vorholt complained of pain due to rainy weather but the medical notes indicate she appeared to walk, sit, stand, and move without difficulty. *Id.* at 20. These other medical notes convinced the ALJ that Vorholt, in fact, was not disabled.

Additionally, the ALJ extensively documented that Vorholt had a substance abuse problem. *See* Tr. at 17-23 (the ALJ's review of many of Vorholt's medical records from December 2003 through October 2006, pointing out instances where Vorholt showed signs of her substance abuse problem). Therein, the ALJ found evidence that her substance abuse was

the cause of some of her mental issues—rather than a legally recognized disability. *Id.* at 18 (noting statement that doctors needed to monitor Vorholt since her substance use appeared connected with episodes of mania). Dr. Ross' report was only one piece of evidence that the ALJ found credible. Most importantly for this review, substantial evidence supported the ALJ's conclusion that Vorholt was not disabled.

Vorholt also contends that the treating physicians had no need to discuss substance abuse because that was not relevant in their medical opinions. In this regard, Vorholt misses the point of what the ALJ is saying when she discredited their medical opinions. The ALJ is saying that, because there was credible evidence demonstrating Vorholt's substance abuse problem and noncompliance, the treating physicians' opinions needed to discuss these issues to be credible in her mind. In other words, the ALJ was unable to find the treating physicians' reports to be credible because of the fact that they failed to adequately address Vorholt's serious problems with substance abuse and noncompliance with treatment.

### *Substantial Evidence Supported the RFC Determination Made by the ALJ*

Vorholt argues that the ALJ's decision should be reversed or remanded because the ALJ made a medical determination without using medical evidence. She is incorrect. The ALJ made a determination of the RFC, which is her responsibility under the Regulations, *see* 20 C.F.R. § 404.1546, and in making this determination, the ALJ did not err.

Vorholt's argument could also be construed to mean that the ALJ did not come to its RFC assessment based on substantial evidence in the record. As previously stated, the ALJ relied on

Dr. Ross' opinion, as well as various other corroborating medical reports from the relevant time period. That is substantial evidence. Therefore, Vorholt's argument has no merit.

What is more, the ALJ properly discounted the treating physicians' conclusions, *see* Tr. at 23; 20 C.F.R. § 404.1527(d)(2), and the testimony of Vorholt. She discounted the treating physicians' conclusions for the reasons previously mentioned. She discounted Vorholt's testimony because she lied about her previous drug use, her interactions with treating physicians, and her lack of compliance with treatment overall. Tr. at 15; *see also Hardaway,* 823 F.2d at 928 ("Since the ALJ has the opportunity to observe the demeanor of a witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference (citing *Houston*, 736 F.2d at 367)). Though she discounted that evidence, the ALJ did rely on other medical evidence in the record, which she found credible, to come to her RFC assessment. *See* Tr. at 16-24. The purpose of this review is to ensure the ALJ relied on substantial evidence, and here she did.

In an effort to show that the ALJ erred in reaching its RFC assessment, Vorholt points to the GAF ratings that some doctors assigned to her, including the GAF rating of 40 that Dr. Deters assigned. *See* R. 14 at 9. This is irrelevant for this Court's review for two reasons. First, the question is not whether there was evidence that supported a different result, but whether substantial evidence supported the ALJ's result. *See Foster,* 279 F.3d at 353 (citing *Gaffney*, 825 F.2d at 100). Hence, the fact that some doctors came to a different RFC assessment does not affect the conclusion that the ALJ's RFC assessment was supported by substantial evidence. Second, Vorholt cites the report of Dr. Deters for support but does not address the fact that the

ALJ discredited that report.  The ALJ, in part, chose not to follow his conclusions because Dr. Deters' report was based on incorrect facts.  Namely, Vorholt had misrepresented her substance abuse history to Dr. Deters, and he completed his report based on her statements—not her medical records.  Tr. at 23.  Further, Dr. Deters found that Vorholt was compliant with treatment, which the ALJ found to be untrue, thereby lessening the credibility of the report.  *Id.*  Finally, even if Dr. Deters did have the correct facts in front of him, the ALJ found that his conclusion did not follow from the facts he had.  *Id.* at 23-24.  Specifically, the ALJ agreed with the state agency physician and pointed out that the self-reported activities of Vorholt contradicted Dr. Deters' conclusion that Vorholt was unable to work.  *Id.* at 23-24.  Consequently, the existence of other reports, like Dr. Deters, are irrelevant since the ALJ reviewed them and only applied the ones that she found credible.  Equally as important, the ALJ discredited those opinions of the treating physicians she did not find credible and set out her reasons for doing so.

**CONCLUSION**

After reviewing the record, the Court finds that the ALJ relied on substantial evidence in discrediting the opinions of Vorholt's treating physicians.  Further, the ALJ made determinations that were consistent with her obligations under the Regulations and were supported by substantial evidence.  That being said, Vorholt's request for reversal of the ALJ's decision or, in the alternative, remand of the proceedings is denied.

Accordingly, it is hereby **ORDERED** as follows:

(1)     The plaintiff's Motion for Summary Judgment, R.14, is **DENIED**;

(2)     The defendant's Motion for Summary Judgment, R. 15, is **GRANTED**; and,

(3)     **JUDGMENT** in favor of the defendant will be entered contemporaneously

herewith.

This the 22nd day of September, 2009.

Signed By:

_Amul R. Thapar_

United States District Judge